**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JONATHAN D. KASCHAK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-15452 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| BANKERS HEALTHCARE | ) | |
| GROUP, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about consumer loans masquerading as business loans. Plaintiff Jonathan Kaschak, a utility lineman, borrowed over $100,000 from Defendant Bankers Healthcare Group, LLC. He used the money to pay off his personal debts, but the loan didn't last.

Kaschak needed cash. So he asked Bankers Healthcare to refinance his loan and extend more credit. Bankers Healthcare declined to refinance the loan. But it offered Kaschak a second loan, which he accepted. He borrowed roughly $70,000.

The loans had lender-friendly terms. The interest rate of each loan was well into the double-digits. Even so, Kaschak buckled down and made substantial payments under both loans. And then, he sued.

Both loans say that they're business loans. But according to the complaint, the loans aren't business loans at all. They're consumer loans in disguise. And Bankers Healthcare knew it.

Basically, Kaschak alleges that Bankers Healthcare made personal loans and masked them as business loans. Bankers Healthcare knew full well that Kaschak wanted personal loans.

And the company knew that Illinois puts limits on the amount of interest that a lender can charge a consumer. So the company made the personal loans look like commercial loans to evade restrictions on the amount of chargeable interest.

The complaint includes three claims under state and federal law. Bankers Healthcare, in turn, moved to dismiss.

For the following reasons, the motion to dismiss is granted in part and denied in part.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

The story begins in 2021, when Jonathan Kaschak received a flyer from Defendant Bankers Healthcare Group LLC. The flyer offered him a loan. *See* Cplt., at ¶ 14 (Dckt. No. 1).

Kaschak is an electrical utility lineman, and he was a receptive audience for the offer of a loan. *Id.* at ¶ 7. At the time, he had "a large number of personal debts," and he wanted to reduce the interest rates. *Id.* at ¶ 15. So Kaschak responded to the flyer and reached out to Bankers Healthcare. *Id.*

Bankers Healthcare circled back by email and offered Kaschak a loan. *Id.* at ¶¶ 16–17. The company said that it would document the loan as a business loan. *Id.* at ¶ 18. Kaschak pushed back, explaining that he was not engaged in any business. *Id.* at ¶ 19.

That revelation didn't trouble Bankers Healthcare. The company responded that it would put down that he was a "consultant" for its own purposes. *Id.* at ¶ 20. Plus, by calling Kaschak a

2

"consultant," the company would not have to report the loan on Kaschak's personal credit report. *Id.*

In reality, Kaschak was not a consultant, and he was not engaged in any business. *Id.* at ¶ 21. And Bankers Healthcare knew it. The company knew that Kaschak was not a consultant and did not want the loan for business purposes. *Id.* at ¶ 22.

Before getting the loan, Kaschak provided information that was consistent with getting a personal loan. Kaschak gave Bankers Healthcare his Social Security number, not an Employer Identification Number. *Id.* at ¶ 24. He gave Bankers Healthcare copies of his paystubs, too. *Id.*

Kaschak also told Bankers Healthcare what he intended to do with the loan proceeds. "When asked for the purpose of the loan, Plaintiff advised that they included paying off credit cards and other loans." *Id.*

As the complaint tells it, Bankers Healthcare documented the loan as a business loan to get around Illinois restrictions on the rate of interest. *Id.* at ¶ 25. But the company never revealed the real reason why it wanted to call the loan a commercial loan. Bankers Healthcare never explained that it was trying to evade statutory limits on the amount of chargeable interest.

Bankers Healthcare made the first loan to Kaschak in July 2021. *Id.* at ¶ 26. The loan agreement identified the debtor as "Jonathan D. Kaschak d/b/a Jonathan D. Kaschak, Consultant." *See* 7/2/21 Loan Agreement (Dckt. No. 1-1, at 2 of 7).

The nominal principal amount of the first loan was $125,355. *See* Cplt, at ¶ 26 (Dckt. No. 1). Kaschak only received $111,955. *Id.* If you're wondering about the $13,000+ gap, you're not alone.

The complaint doesn't fill in the $13,000+ gap in the story. But based on the loan agreement, it looks like Bankers Healthcare took a big bite out of the loan through fees. The

loan agreement included a "Doc Fee" of $2,995, an "Optional Limited Personal Guaranty" of $7,840, a "reimbursable Servicing Fee" of $2,520, and a "Wire Fee" of $45. *See* 7/2/21 Loan Agreement (Dckt. No. 1-1, at 2 of 7). That's $13,400 of the $125,355.

The loan agreement contains lots of small print, using a font size that only an ant could enjoy. By the look of things, based on the nearest ruler, it looks like each letter was only a millimeter, give or take. That's pretty small. Putting one millimeter in perspective, lice are two or three millimeters long.

This Court did some textual detective work with assistance from a nearby "everything" bagel. The letters in the loan agreement are noticeably smaller than a sesame seed. In fact, a sesame seed is larger than some of the *words*. The letters are about the size of a poppy seed. And the pieces of roasted garlic dwarf everything.

It's the font size that you would pick if you didn't want the other side to actually read it. After all, reading small print is a pain in the neck (and a pain on the eyes). It's hard to read, so it's a deterrent to getting read. One could be forgiven for thinking that drafters of contracts sometimes use small print to deter the other side from reading it.

As you might guess, the fine print had plenty of lender-friendly provisions.

The loan agreement required Kaschak to make 84 payments of $2,689.34. *Id.* That's a whopping $225,904.56 to repay a loan of $111,955. *See* 7/2/21 Loan Agreement (Dckt. No. 1-1, at 3 of 7) ("FOR COMMERCIAL PURPOSES AND VALUE RECEIVED, Debtor does hereby promise to pay to Creditor . . . the total sum of Two Hundred Twenty-Five Thousand, Nine Hundred Four DOLLARS and Fifty-Six CENTS ($225,904.56).").

It doesn't take a math whiz to see that the amount of the repayment is double the amount of the loan. Borrow $111,955, and then pay $225,904.56.

According to the complaint, the annual percentage rate (APR) on the loan was roughly 22.96%. *See* Cplt., at ¶ 28 (Dckt. No. 1). But Addendum "A" to the loan agreement stated that the interest rate was 18.74%. *See* 7/2/21 Loan Agreement (Dckt. No. 1-1, at 6 of 7).

The loan agreement included other lender-friendly provisions, too. The loan agreement prohibited Kaschak from prepaying any part of the loan for 48 months. *Id.* at 3 of 7.

Doing a little math, 48 months x $2,689.34 per month equals $129,088.32. So, at the very least, the loan agreement required Kaschak to fork over $129,088.32 to repay the loan of $111,955.

The loan agreement required Kaschak to make repayments through ACH debit.[1] *See* Cplt., at ¶ 26 (Dckt. No. 1); *see also* 7/2/21 Agreement (Dckt. No. 1-1, at 3 of 7). The agreement included a choice-of-law provision, too. Illinois law governed the contract. *See* Cplt., at ¶ 26.

Kaschak signed the loan agreement. Right below the signature block, the loan agreement identified the debtor as "Jonathan Kaschak – Owner," followed by "Jonathan D. Kaschak d/b/a Jonathan D. Kaschak, Consultant." *See* 7/2/21 Loan Agreement (Dckt. No. 1-1, at 4 of 7). In a similar vein, the accompanying settlement statement referred to the borrower as "Jonathan Kaschak – Owner." *Id.* at 2 of 7.

Kaschak ultimately received the funds. And when he got his hands on the money, Kaschak acted like a consumer who had received a personal loan. He did not use the proceeds for business purposes. Instead, Kaschak used the money for personal, family, or household purposes. *See* Cplt., at ¶ 23 (Dckt. No. 1).

---

[1] "An ACH debit transaction is a debit directly from a personal savings, personal checking, or business checking account." *What is an ACH debit transaction?*, EPA, https://www.epa.gov/lead/what-ach-debit-transaction (last visited Apr. 8, 2024).

The money didn't last. After about a year, Kaschak ran short on cash. *Id.* at ¶ 29. So he contacted Bankers Healthcare about the possibility of refinancing the loan and receiving additional credit. *Id.*

Bankers Healthcare declined to refinance the loan. *Id.* But it offered Kaschak another loan. *Id.* Kaschak agreed.

Bankers Healthcare and Kaschak entered into a second loan agreement in September 2022. *Id.* at ¶ 30. The nominal principal was $76,900. *Id.* But Kaschak received only $69,955. *Id.*

Once again, fees took a big bite out of the loan. The agreement included almost $7,000 in fees, including $950 for a "doc fee," $4,200 for "Optional Limited Personal Guaranty," $1,750 for a "Reimbursable Servicing Fee," and $45 for a "Wire Fee." *See* 9/21/22 Loan Agreement (Dckt. No. 1-3, at 3 of 6).

The loan agreement required Kaschak to make 96 payments of $1,207.56 each, all by ACH debit. *Id.* at 6 of 6. That's $115,925.76 to borrow $69,955. *Id.*

The second loan agreement was less restrictive about prepayment than the first loan agreement. The second loan agreement prohibited Kaschak from repaying the loan for at least 12 months. *Id.* at 3 of 6.

According to the complaint, the loan had an APR of about 13.81%. *See* Cplt., at ¶ 32 (Dckt. No. 1). But the second loan agreement says that the interest rate was 10.99%. *See* 9/21/22 Loan Agreement (Dckt. No. 1-3, at 6 of 6).

The second loan agreement provided that Florida law – not Illinois law – governed. *Id.* at 3 of 6.

The second loan agreement gave a different description of the debtor.  The second loan agreement identified the debtor as "Jonathan D. Kaschak d/b/a Jonathan D. Kaschak, Sole Proprietor."  *Id.*

So, in the first loan, Kaschak was a consultant, but in the second loan, Kaschak was a sole proprietor.  But according to the complaint, Kaschak was just an ordinary person who wanted a loan to pay his bills.

Kaschak made substantial payments under both loans.  *See* Cplt., at ¶ 33 (Dckt. No. 1).  The complaint does not allege that Kaschak defaulted, or failed to make any payments, or anything of that sort.  By the look of things, the repayment went smoothly.

And then, Kaschak sued.  He claims that Bankers Healthcare made "usurious and oppressive loans" in violation of Illinois law.  *Id.* at ¶ 34.  According to him, Bankers Healthcare covered up the purpose of the loans and did not give proper disclosures.  *Id.*

Kaschak's complaint includes three counts under state and federal law.  *See id.* at 6–9.

Count I is a claim under the Illinois Interest Act, 815 ILCS 205/4.  *Id.* at ¶¶ 35–43.  Kaschak alleges that Bankers Healthcare, an unlicensed lender, made him a consumer loan at an interest rate of more than 9%.  *Id.*

Count II is a claim under the Electronic Funds Transfer Act, 15 U.S.C. § 1693k.  *Id.* at ¶¶ 44–47.  Kaschak claims that the loan agreements required him to repay a consumer loan by electronic fund transfers, in violation of federal law.  *Id.*

Finally, Count III is a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2.  *Id.* at ¶¶ 48–52.  Kaschak contends that Bankers Healthcare violated that statute by:  (1) making a usurious and oppressive loan, (2) resorting to

false statements of business purpose to cover up the usurious nature of the loan, and (3) violating the Electronic Funds Transfer Act. *Id.* at ¶ 49.

Bankers Healthcare moved to dismiss for failure to state a claim, and moved to dismiss one of the claims for lack of standing. *See* Mtn. to Dismiss (Dckt. No. 15).

### Legal Standard

A motion to dismiss under Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint. When it comes to standing, a party can bring a facial challenge or a factual challenge. Courts "must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in plaintiff's favor, unless standing is challenged as a factual matter." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 624 (7th Cir. 2017) (quoting *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015)).

If a party brings a factual challenge to standing, a district court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citing *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993)); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, a district court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"When ruling on a motion to dismiss, the court may consider 'documents . . . attached to the complaint, documents . . . central to the complaint and . . . referred to in it, and information that is properly subject to judicial notice.'" *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) (quoting *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013)).

Claims of deceptive acts or practices under the Illinois Consumer Fraud and Deceptive Business Practices Act require the plaintiff to meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b). The plaintiff must allege the "who, what, when, where, and how" of the alleged fraud. *See Vanzant*, 934 F.3d at 738.

### Analysis

### I.     Illinois Interest Act (Count I)

The first claim involves the Illinois Interest Act, 815 ILCS 205/4. *See* Cplt., at ¶¶ 35–43 (Dckt. No. 1). The gist of the claim is that the loan agreements charged too much interest, in violation of Illinois law.

The Illinois Interest Act limits the amount of interest that a lender can charge. The statute sets the ceiling at an "annual percentage rate of 9%." *See* 815 ILCS 205/4(1).

But the statute includes a few exceptions. One exception covers "any business loan to a business association or copartnership or to a person owning and operating a business as sole proprietor." *See* 815 ILCS 205/4(1)(c). The statute defines a "business" as a "commercial, agricultural or industrial enterprise which is carried on for the purpose of investment or profit." *Id.*

That language raises a question: when is a loan a "business loan"?

In Bankers Healthcare's view, both loans are business loans. *See* Def.'s Mem., at 7 (Dckt. No. 16). Why? Because the loan agreements say so.

Bankers Healthcare points to language in the loan agreements that characterize the loans as business loans. And sure enough, the loan agreements are chock-full of language saying that they are commercial loans.

For example, the title of the first loan agreement is "FINANCING AGREEMENT (Sole Proprietorship)." *See* 7/2/21 Loan Agreement (Dckt. No. 1-1, at 3 of 7). The loan agreement identifies the borrower as "Jonathan D. Kaschak d/b/a Jonathan D. Kaschak, Consultant." *Id.* The loan agreement begins with the phrase "FOR COMMERCIAL PURPOSES AND VALUE RECEIVED." *Id.*

The agreement refers to itself as a "COMMERCIAL LOAN," albeit in tiny print. *Id.* The agreement even includes a section entitled "COMMERCIAL TRANSACTION," which says that Kaschak "hereby acknowledges, warrants, and represents that this is a commercial transaction," and that "the Debtor is in fact a business." *Id.* at 4 of 7. Comparable language appears in the second loan agreement, too.

10

From a doth-protest-too-much perspective, one could be forgiven for wondering why the loan agreements go out of their way to say that they are commercial loans. It's the contractual equivalent of "nothing to see here."

The text of the loan agreements is evidence that the loans were commercial loans. But at this early stage, it is not *dispositive* evidence. A loan isn't a commercial loan simply because the loan agreement says so.

Under Illinois law, the four corners of a contract do not control whether a loan is a commercial loan. Instead, Illinois courts look behind the curtain of the contract and gaze at what's actually happening. Illinois law pierces the contractual veil, and looks at the reality lurking behind the language of the contract.

As a starting point, Illinois courts apply a simple strategy when deciding whether a loan is a business loan: follow the money. Courts look to the actual use of the funds, and have "found significant the fact that proceeds of the loan were in fact used for business purposes." *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 228 (7th Cir. 1996); *see also Preferred Cap. Lending, Inc. v. Chakwin*, 2015 WL 5920789, at *3 (N.D. Ill. 2015).

The recipient of the money is important, too. Illinois courts consider whether borrowers "directed the proceeds of the loan to be paid" to a corporation. *See Whirlpool Fin. Corp.*, 96 F.3d at 228. A related factor is whether "the loans had been obtained in anticipation of future financial gain" to a corporation. *Id.*

Courts consider all facts and circumstances when deciding whether a loan is a business loan. "The Illinois courts have taken a fairly pragmatic approach to determining whether a particular loan falls within one of the categories of 'business loans' enumerated in subsection 4(1)(c)." *Id.* at 227.

11

If the loan went to a consumer, and if the debtor used the money for personal expenses, there's a good chance that it's a consumer loan, not a commercial loan. If it walks like a duck, and quacks like a duck, then it's probably a duck – even if the duck calls itself a chicken.

The substance is what matters. "Whether a loan is usurious depends on whether the party intended to charge unlawful interest. This question of fact is determined by the nature and substance of the transaction rather than its form, to insure against evasion of the statute by a party's ingenious schemes or devices." *Saskill v. 4-B Acceptance*, 453 N.E.2d 761, 765 (Ill. App. Ct. 1983) (citations omitted); *see also Jackson v. Payday Fin., LLC*, 79 F. Supp. 3d 779, 785 (N.D. Ill. 2015).

When it comes to deciding whether a loan is a business loan, it's substance over form, not form over substance. Slapping a "commercial loan" nametag on a personal loan doesn't make it a commercial loan. A rose by any other name would smell as sweet. *See* William Shakespeare, Romeo and Juliet, act II, sc. 2. And a pig by any other name would still be a pig.

A different approach would make it all too easy to evade the statute. After all, the whole point of the statute is to outlaw certain types of contracts. It would be funny if people could use a contract to get around a statute that prohibits certain contracts.

By way of analogy, imagine if a statute prohibited the sale of tigers. Then, imagine if the ringmaster of a circus had a few extra tigers laying around, and wanted to offload one of the tigers and sell it to one of the clowns. And then, imagine if the ringmaster and the clown agreed in the contract that the tiger was really a dog. Would the language of the contract foreclose a claim that the contract was unlawful? Unlikely. *See EEOC v. Boeing Servs. Intern.*, 968 F.2d 549, 556 n.7 (5th Cir. 1992) ("[I]f the issue was before us, we would not hold that a cat was a dog simply because a defendant called the cat a dog.").

It doesn't take much imagination to envision how that principle would wreak havoc. All sorts of statutes prohibit contracts of one form or another. What if a supplier and a purchaser entered into an agreement that violated the antitrust laws? Could they contract around that problem by agreeing that the contract is not a restraint of trade?

And what about an employment contract that is blatantly discriminatory? Could an employer and an employee avoid the discrimination laws by adding contractual language saying that there is no discrimination? What about a contract for the sale of an unlawful firearm, where an M-16 is called a handgun? Or a contract for the sale of "baby powder," when it's really cocaine? And so on.

A lender can't get around a consumer protection statute simply by getting a consumer to sign a document saying that the consumer isn't really a consumer. The statute exists to protect consumers and prohibit certain contracts. Parties cannot use a contract to get around a statute that prohibits the contract. If both parties knew that the language of the agreement was phony baloney, it is hard to see how the phony baloney could provide a saving grace.

"Because I said so" isn't persuasive to anyone (except parents). And in this context, "because the contract says so" isn't persuasive, either. When the validity of the contract is at issue, courts are free to look behind the words, and see what's actually happening.

At the end of the day, the Illinois Interest Act looks at what happened in the real world. The label on a contract might not reflect the reality of the situation. And under Illinois law, substance matters.

Kaschak alleged that the loan agreements aren't what they purport to be. The complaint alleged that the loans were personal loans, not commercial loans – and Bankers Healthcare knew it. At this early stage, that's enough for the claim to live to fight another day.

13

Next, Bankers Healthcare relies on transcripts of calls that a representative of the company had with Kaschak before each loan. During each call, he apparently confirmed that the loan was, in fact, a business loan.

As an aside, the jury's out on how persuasive those transcripts will be at trial. Each call is almost identical. It reads like someone marched through a checklist, reading a list of scripted questions in rote fashion. It's the type of call that someone might do simply to make a self-serving record. Maybe it's just camouflage.

Even so, at this stage, the persuasiveness of the transcripts is not the issue. The transcripts are extrinsic evidence. The motion-to-dismiss stage is not the time or the place for a defendant to wheel out all of its evidence. At this early stage, the question is simply whether the complaint does enough to state a claim. The question is not whether the plaintiff has a winning claim.

There is nothing wrong with a lender confirming that a business loan is, in fact, a business loan. That's a good thing, not a bad thing, because lenders have a duty to comply with the law. Still, Kaschak alleges that Bankers Healthcare knew the truth, and made the loans look like business loans even though it knew that he was a consumer looking for a consumer loan. That allegation states a claim.

In the end, the procedural posture of the case is enough to resolve this dispute. At the motion-to-dismiss stage, the Court must accept all well-pled facts as true. And here, Kaschak alleges that Bankers Healthcare made a consumer loan, and papered-over that reality to disguise it as a business loan. That's enough to state a claim.

14

## II.     Electronic Funds Transfer Act (Count II)

The second claim falls under the Electronic Funds Transfer Act, 15 U.S.C. § 1693k.  *See* Cplt., at ¶¶ 44–47 (Dckt. No. 1).  The claim is about the contractual obligation to pay by electronic transfers.

The statute prohibits a lender from "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."  *See* 15 U.S.C. § 1693k.

Kaschak alleges that the loan agreements violated that statute by requiring payments through ACH.  An ACH authorization gives a lender permission to take money directly from an account, and do so electronically when the money is due.

Bankers Healthcare moves to dismiss on two grounds.  First, the company contends that Kaschak lacks standing because he did not suffer an injury in fact.  *See* Def.'s Mem., at 11 (Dckt. No. 16).  Second, the company argues that the complaint fails to state a claim because the loan agreements provide for alternative (*i.e.*, non-ACH) methods of payment.  *Id.*

### A.     Standing

Before diving into the merits, the Court must secure its footing, from a standing perspective.

Article III empowers federal courts to hear cases and controversies, and one of the bedrock requirements is the existence of standing.  A plaintiff has standing only if that party "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also Pennell v. Glob. Tr. Mgmt., LLC*, 990 F.3d 1041, 1044 (7th Cir. 2021).

To establish an injury in fact, a plaintiff must show that she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc.*, 578 U.S. at 341. "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* at 340. The injury must be "'real,' and not 'abstract.'" *Id.*

Pocketbook injuries count as injuries. Decades ago, the Supreme Court recognized that economic injuries may support standing. *See Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing."). "The injury-in-fact necessary to support standing may be an economic injury." *See* 15 James Wm. Moore *et al.*, *Moore's Federal Practice* § 101.40[5][c] (3d ed. 2019).

Standing is "not dispensed in gross." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). That is, a plaintiff must have standing for "each claim." *Id.* A plaintiff could have standing to bring one claim, but lack standing to bring some other claim.

Standing is not in-for-a-penny, in-for-a-pound. Getting your foot in the door of the federal courthouse for one claim does not guarantee that the other foot can come along for the ride.

Bankers Healthcare argues that Kaschak has failed to allege that he suffered an injury in fact. *See* Def.'s Mem., at 11 (Dckt. No. 16). Kaschak responds that he suffered financial harm because of the automatic ACH transfers. *See* Pl.'s Resp., at 11 (Dckt. No. 22). According to Kaschak, he attempted to cancel the ACH authorization, but Bankers Healthcare "continued submitting debits, causing Plaintiff to incur fees." *Id.*

Kaschak alleges that he suffered a pecuniary loss because of the automatic ACH payments. At the pleading stage, that's enough to allege an injury. An out-of-pocket loss is a ticket into the federal courthouse. If the claim doesn't pan out as a factual matter, Bankers Healthcare could raise it in a motion for summary judgment.

### B.    The Merits

On the merits, Kaschak claims that the loan agreements violated federal law by requiring payments by electronic fund transfer.

The Electronic Funds Transfer Act creates a set of rules for electronic payments by consumers. Congress concluded that the "rights and liabilities of consumers" were "unclear" when it came to "the use of electronic systems to transfer funds." *See* 15 U.S.C. § 1693a. So Congress passed the statute to fill the void and pin down consumer rights.

The statute "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." *See* 15 U.S.C. § 1693b. The text explains that the "primary objective of this subchapter . . . is the provision of individual consumer rights." *Id.*

As a starting point, the statute provides that the "terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service." *See* 15 U.S.C. § 1693c. The disclosures must use "readily understandable language." *Id.*

The statute includes a special provision about electronic transfers for consumer loans. The Act provides that "[n]o person may . . . condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers . . . ." *See* 15 U.S.C. § 1693k(1). The only exceptions involve credit under an overdraft credit plan, or credit

17

extended to maintain a specified minimum balance in the consumer's account. *See* 12 C.F.R.
§ 205.10(e)(1).

The statute focuses on the moment of contract formation. A lender may not "condition"
the "extension" of credit on repaying the loan electronically. *See* 15 U.S.C. § 1693k(1). The
statute takes an *ex ante* perspective, and imposes a ban when the lender and the consumer agree
to the loan in the first place.

The statute defines an "electronic fund transfer" as "any transfer of funds, other than a
transaction originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct,
or authorize a financial institution to debit or credit an account." *See* 15 U.S.C. § 1693a(7).

Kaschak claims that the loan agreements violated the statute by requiring payment
through ACH transfers. *See* Cplt., at ¶¶ 26(d), 30(d) (Dckt. No. 1). And sure enough, the loan
agreements contain language that requires electronic transfers.

The loan agreements include a paragraph entitled "AUTOMATIC PAYMENT (ACH)."
*See* 7/2/21 Agreement (Dckt. No. 1-1, at 3 of 7); *see also* 9/21/22 Agreement (Dckt. No. 1-3, at 3
of 6). Based on the Court's tape measure, the entire paragraph is 5/16th of an inch tall.

The paragraph begins with a sentence that required Kaschak to pay only through ACH
transfers. "All payments in accordance with this Note shall be made in the form of an ACH
transfer directly from the Debtor's business account." *Id.*

By the look of things, that provision seems to fall within the reach of the statute. The
statute provides that "[n]o" lender may "condition the extension of credit to a consumer" on
repayment by "electronic fund transfers." *See* 15 U.S.C. § 1693k(1). But the loan agreements
say that "[a]ll payments . . . shall be made" by ACH transfers. *See* 7/2/21 Agreement (Dckt.

No. 1-1, at 3 of 7); *see also* 9/21/22 Agreement (Dckt. No. 1-3, at 3 of 6). The statute says "no," but the loan agreements say "all."

In response, Bankers Healthcare points out that the loan agreements leave the door open to the possibility of paying by other means. *See* Def.'s Mem., at 11 (Dckt. No. 16). According to the company, the loan agreements "expressly permit repayment through additional payment methods." *Id.* at 1; *see also id.* at 11.

Bankers Healthcare doesn't point to any specific language. It doesn't quote any language, either. And it doesn't offer a citation, except a blanket reference to an entire page of the contract, which is stuffed with microprint. *Id.* at 11 (citing "page two of both agreements," which the Court reads to mean the second page of the exhibit, which is really the first page of the contract).

Maybe Bankers Healthcare was referring to the sentences that followed the sentence that created the duty to pay by ACH transfers. Again, the paragraph begins with a blanket requirement: "All payments in accordance with this Note shall be made in the form of an ACH transfer directly from the Debtor's business account." *See* 7/2/21 Agreement (Dckt. No. 1-1, at 3 of 7); *see also* 9/21/22 Agreement (Dckt. No. 1-3, at 3 of 6). But the paragraph didn't stop there. It went on to explain what would happen if Kaschak terminated the ACH authorization, with or without consent.

It offered two bad options.

"The Debtor's termination of an ACH authorization *without* the Creditor's prior written *consent* shall be considered an event of default. Should Debtor terminate an ACH authorization *with* the *consent* of Creditor, and delivers [sic] payments by check or other non-ACH form of payment, Debtor agrees to pay a service, handling and accounting expense fee to Creditor

resulting from the making of a non-ACH payment in an amount equal to fifteen percent (15%) of the payment then due." *Id.* (emphasis added).

As Bankers Healthcare sees things, the loan agreements offered Kaschak an exit ramp. The loan agreements allowed Kaschak to seek the company's consent before terminating the authorization. And the loan agreements allowed for the possibility that Bankers Healthcare might give that consent, which would allow Kaschak to pay by other means. So, in the company's view, the loan agreements didn't categorically require payments by ACH transfer.

That's cold comfort. The reality is that the loan agreements required Kaschak to pay by ACH transfer, or else he would get hammered.

The agreements included a bright-line rule. "All payments . . . shall be paid in the form of an ACH transfer." *Id.* The words "all" and "shall" don't leave a lot of wiggle-room. *Id.* The agreements cover every payment ("all"), and create a mandatory obligation ("shall") to pay by electronic transfer.

Kaschak couldn't cut the cord without permission. If Kaschak tried to pull the plug and terminate the ACH authorization without consent, that termination would be an "event of default." *Id.* And then, "the entire amount of principal then unpaid and all unpaid interest shall become, without notice or demand, at the option of the Creditor, immediately due and payable." *Id.*

Even if Bankers Healthcare gave its consent, bad things would happen. If Kaschak terminated the ACH authorization with the company's consent, and then made the payment by check or other means, then Kaschak would have to pay a "service, handling and accounting expense fee" of "fifteen percent (15%) of the payment then due." *Id.*

20

By the look of things, it was a choice between a sledgehammer and a mallet. If Kaschak terminated *without* consent, then he would commit a default, and the entire amount of the debt became due. If Kaschak terminated *with* consent, then he would owe the amount of the monthly payment that was then due, plus 15%.

That's not much of an exit ramp. The loan agreements required Kaschak to pay by electronic transfer. If he didn't, then he had to pay everything (because of a default), or pay more (because of the 15% fee). If that's a choice, it's not much of a choice.

Other courts have held that the statute applies to a loan agreement even if the consumer can revoke the authorization for electronic transfers at any time. *See FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 812 (C.D.S.D. 2013); *O'Donovan v. CashCall, Inc.*, 2009 WL 1833990, at *3 (N.D. Cal. 2009) ("The right to later cancel EFT payments does not allow a lender who conditions the initial extension of credit on such payments to avoid liability.").

If that's true, then surely the statute applies if Kaschak could cancel only with the consent of Bankers Healthcare, and only if he paid a 15% fee. In fact, Kaschak stood in a worse position than the plaintiffs in *PayDay* and *CashCall*. Unlike those plaintiffs, Kaschak didn't have a right to revoke. And even if Bankers Healthcare gave him permission, then he would have to pay more.

Overall, the complaint does enough to allege a violation of the Electronic Funds Transfer Act. The statute says that lenders cannot require consumers to pay loans by electronic transfers as a condition to getting a loan. *See* 15 U.S.C. § 1693k(1). Bankers Healthcare extended credit. It did so based on the conditions in the loan agreements. And one of the conditions required payments by ACH transfers. That's enough to state a claim.

### III.     Illinois Consumer Fraud Act (Count III)

The final claim falls under the Illinois Consumer Fraud and Deceptive Business Practices Act (for those who crave acronyms, "ICFA"), 815 ILCS 505/2.  *See* Cplt., at ¶¶ 48–52 (Dckt. No. 1).

"The ICFA is a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices."  *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 704 (N.D. Ill. 2020) (cleaned up).

The statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."  *See* 815 ILCS 505/2.

"A plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010).  "The elements of a claim under the ICFA are: '(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce.'"  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) (quoting *Siegel*, 612 F.3d at 934).

Kaschak asserts that Bankers Healthcare violated the Act in three ways:  (1) making a usurious and oppressive loan, (2) resorting to false statements of business purpose to cover up the usurious nature of the loan, and (3) violating the Electronic Funds Transfer Act.  *See* Cplt., at ¶ 49 (Dckt. No. 1).

In Bankers Healthcare's view, the complaint fails to plead that it engaged in a deceptive act or an unfair act. The company also asserts that a violation of the Electronic Funds Transfer Act cannot give rise to a claim. The Court will address each argument in turn.

### A. Deceptive Act

The first argument is about pleading with particularity. The Court agrees that Kaschak needs to allege more details to state a fraud-based claim.

"To establish a violation of the [I]CFA's prohibition on deceptive acts or practices, a plaintiff must prove that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving a trade or commerce." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (citations omitted).

When alleging a deceptive act under the ICFA, a plaintiff must satisfy the heightened pleading requirement of Rule 9(b). *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). A plaintiff must plead "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992).

Rule 9(b) requires specifics, not generalities. A complaint must describe the "who, what, when, where, and how" of the fraud, "the first paragraph of any newspaper story." *See United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). It's the difference between a sportswriter saying that a local team won a sporting event, and saying that the '85 Bears crushed the Patriots by a score of 46-10 in Super Bowl XX in New Orleans, thanks to Walter Payton, the best defense of all time, and Da Coach.

23

Granularity serves an important purpose. After all, accusing someone of fraud is serious business. Requiring specifics helps to winnow out insubstantial claims on the front end. It forces a plaintiff to perform a pre-complaint investigation and think through the claim before launching a missive at the other side. It empowers district courts to act as gatekeepers, and it protects defendants from shaky, shadowy claims. *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 840 (7th Cir. 2018); *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748–49 (7th Cir. 2005); *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). It helps the parties frame discovery, too.

In Bankers Healthcare's view, Kaschak "relies simply on the terms of his loan for the deceptiveness prong." *See* Def.'s Mem., at 13 (Dckt. No. 16). It believes that Kaschak failed to allege how "he was deceived into making the allegedly false statements." *Id.* at 14. And it argues that Kaschak's statements are too vague to satisfy Rule 9(b)'s heightened pleading requirement. *Id.*

Kaschak alleges that, after he contacted Bankers Healthcare, the company "responded that it would state that Plaintiff was a 'consultant' for its own purposes and so it would not have to report the loan on Plaintiff's personal credit report." *See* Cplt., at ¶ 20 (Dckt. No. 1).

That is, Kaschak asserts that Bankers Healthcare told him that it would list him as a consultant to avoid reporting the loan on his personal credit report. *Id.* But he alleges that the company *actually* documented the loan as a business loan "to evade Illinois restrictions on the rate of interest that may be charged." *Id.* at ¶ 25.

Kaschak's allegations fall short of Rule 9(b)'s heightened pleading requirement. The pleading leaves too many questions unanswered. The complaint doesn't allege a lot of details

about what happened when Kaschak told Bankers Healthcare that he wanted a consumer loan. And it doesn't include many specifics about how the company responded.

*What* did Kaschak tell the company? *Who* did he contact, and *when*? *When* did someone tell Kaschak to list himself as a consultant? *Who* told him that? *How* was the information conveyed? And so on.

At this stage of the proceedings, Kaschak does not need to show, beyond doubt, that Bankers Healthcare engaged in fraud. *See Uni\*Quality, Inc.*, 974 F.2d at 923. Even so, he must answer the "who, what, when, where, and how" of the circumstances surrounding the fraud. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted). On that front, he falls short. The complaint sketches an outline, but does not fill in the details.

In sum, Kaschak's allegations are too vague to support an inference of fraud under Rule 9(b)'s heightened pleading requirement. So, his allegations about deception under the ICFA do not survive the motion to dismiss.

### B. Unfair Act

The other possible route under the statute involves allegations of unfair acts. *See* 815 ILCS 505/2 (prohibiting "unfair or deceptive acts or practices").

When determining whether conduct is unfair under the ICFA, Illinois courts consider three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002). A plaintiff need not meet all three factors. A "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*; *see also Horist v. Sudler & Co.*, 941 F.3d 274, 280 (7th Cir. 2019).

25

A practice "offends public policy" when "the practice violates statutory or administrative rules establishing a certain standard of conduct." *Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 716 (N.D. Ill. 2018). "[A] practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 631 (N.D. Ill. 2019) (quoting *Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc.*, 633 F.Supp.2d 610, 616 (N.D. Ill. 2009)).

A plaintiff does not have to plead unfair conduct with particularity under Rule 9(b), because unfair conduct is not the same thing as "fraud or mistake." *See* Fed. R. Civ. P. 9(b); *see also Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) ("Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)."); *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir. 2019).

In Bankers Healthcare's view, Kaschak's allegations about unfairness fail because – even assuming that the loans are consumer loans – the APRs fell "significantly below the maximum allowable rate of 36% under the Predatory Loan Prevention Act, 815 ILCS 123/15-5-5." *See* Def.'s Mem., at 13 (Dckt. No. 16). The company also argues that Kaschak has failed to identify any specific disclosures that he should have received but did not receive. *Id.* at 14.

Pushing back, Kaschak argues that "[c]harges in excess of those permitted by law are 'unfair' under *Robinson*." *See* Pl.'s Resp., at 12 (Dckt. No. 22). He asserts that Bankers Healthcare engaged in unfair practices by offering him loans at higher rates than the maximum amount permitted for unsupervised consumer lenders. *Id.* at 13.

26

Kaschak has done enough to plead an ICFA claim rooted in unfairness. As the Court explained, Kaschak adequately pleads a claim under the Illinois Interest Act. His ICFA claim is partly based on the same allegations – *i.e.*, that Bankers Healthcare provided him loans at impermissibly high interest rates.

That conduct also supports an ICFA claim about unfair conduct. *See Jackson*, 79 F. Supp. 3d at 788 (allowing an ICFA claim about impermissible interest to move forward and opining that "the alleged assessment of interest over 100% is unscrupulous and oppressive and sufficiently constitutes an unfair practice").

So, Kaschak can proceed with an ICFA claim based on unfair conduct.

That said, not every part of the claim survives. Kaschak alleges that he did not understand the interest rates in the loan agreements. *See* Cplt., at ¶ 34 (Dckt. No. 1). The loan agreements included an Addendum, which stated that the interest rate was 18.74% on the first loan and 10.99% on the first loan. *See* 7/2/21 Agreement (Dckt. No. 1-1, at 6 of 7); *see also* 9/21/22 Agreement (Dckt. No. 1-3, at 3 of 6). A party "cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract." *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 767 (7th Cir. 2010) (quotation omitted).

A theory that Kaschak didn't understand the numbers in the contract cannot survive. But maybe his theory is that the numbers are wrong. Or maybe he is alleging that the loan agreements miscalculated the interest rates. After all, the complaint alleges that the first loan had an APR of 22.96% (not 18.74%), and alleges that the second loan had an APR of 13.81% (not 10.99%). *See* Cplt., at ¶¶ 28, 32 (Dckt. No. 1); 7/2/21 Loan Agreement (Dckt. No. 1-1, at 6 of

7); 9/21/22 Loan Agreement (Dckt. No. 1-3, at 6 of 6).  If that's the theory, Kaschak can move to amend the complaint.

### C.    Electronic Funds Transfer Act

Finally, Bankers Healthcare argues that the Electronic Funds Transfer Act is not a predicate under the ICFA.  *See* Def.'s Mem., at 12 (Dckt. No. 16).  That is, the question is whether a violation of the Electronic Funds Transfer Act counts as an "unfair practice" and gives rise to a claim under the ICFA.

Out of the gate, the company recognizes "the unremarkable position that unfair or deceptive conduct may violate multiple statutes."  *See* Def.'s Reply, at 13 (Dckt. No. 23).

The company points to a provision in the statute entitled "Violations of other Acts."  *See* 815 ILCS 505/2Z.  The statute gives a long list of more than 30 state statutes.  *Id.*  And then, the text says that "[a]ny person who knowingly violates" any of those statutes "commits an unlawful practice within the meaning of this Act."

Bankers Healthcare points out that the (federal) Electronic Funds Transfer Act is not in the list.  In its view, the absence of a reference to the Electronic Funds Transfer Act speaks volumes.  Applying a familiar canon of construction (*expressio unius est exclusio alterius*), the company argues that a violation the Electronic Funds Transfer Act cannot give rise to a claim.

This Court isn't so sure.  By the look of things, the list includes state statutes, not federal statutes.  The text is silent on whether a violation of a federal statute can give rise to liability under the ICFA.  And more broadly, Bankers Healthcare doesn't cite any Illinois case law supporting the notion that the list of statutes is exhaustive.

The text says that a violation of Statutes 1–31 is an unlawful practice within the meaning of the Act.  It doesn't say whether a violation of any other statutes can give rise to a claim under

the IFCA, too.  Maybe Illinois courts infer meaning from textual silence, based on the canon of construction, or maybe they don't.  Maybe a list of 31 statutes conveys breadth, not exclusivity.

The briefing on this issue is too cursory.  Based on the submissions, the Court doesn't have much Illinois case law to go on.  So, for now, the claim survives.  The parties can address this argument again when the time comes for dispositive motions.

### Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion to dismiss.


Date:   April 25, 2024

                                          Steven C. Seeger
                                          United States District Judge